A95A0177, A95A0353. ROSEBERRY et al. v. BROOKS, M. D., et al.; and vice versa.

(461 SE2d 262)

McMURRAY, Presiding Judge.

In this action for medical negligence, plaintiff Gary B. Roseberry is the representative of the estates of his wife, Allegra Roseberry (deceased), and that of Amy Roseberry (deceased), a "twenty-three week gestation child, . . . whose life was terminated during the twenty-third week of term of the deceased mother's pregnancy." The complaint alleges that Allegra Roseberry was admitted to DeKalb General Hospital on March 21, 1988, and discharged on March 24, 1988, with a diagnosis of "sclerosing cholangitis." On June 5, 1988, while she was under the primary care of defendant Walter S. Brooks, M. D., Allegra Roseberry was diagnosed as having "a malignant disease known as cholangiocarcinoma," i.e., liver cancer. Although Allegra Roseberry had informed Dr. Brooks on June 3, 1988, "that her last menstrual period occurred January 14, 1988, [he] failed to perform a pregnancy test, failed to perform a pelvic examination and, as a result, failed to diagnose [Allegra Roseberry] as being pregnant." Allegra Roseberry reentered the hospital on August 2, 1988, for treatment of her liver cancer, where, after a sonogram examination, "it was determined that [she] was twenty-three weeks pregnant." Dr. Brooks, "a gastroenterologist, without consultation of a pediatrician or perionatologist, recommended that [Allegra Roseberry] consent to a clinical abortion to be performed by Defendant [Young W. Ahn, M. D.]. . . ." Allegedly "at the direction of her physicians, after being informed that the unborn child would be 'doomed,' and the stress of the pregnancy was impairing her health, [Allegra Roseberry] consented to a clinical abortion." On August 9, 1988, "less than four days [after] the clinical abortion," Allegra Roseberry herself died of gram-negative sepsis (infection). Defendants Dr. Brooks, Dr. Ahn, and The Emory Clinic, a Georgia partnership allegedly liable for the negligence of Dr. Brooks and Dr. Ahn under the doctrine of respondeat superior, denied the material allegations and the case was tried before a jury.

In support of plaintiff's contentions, the following evidence was adduced: Gary and Allegra Roseberry were married in 1967. After they had been "married about five years," they thought about having a child. However, they experienced difficulties because Allegra Roseberry was a "victim of infertility." Through an expensive course of treatment (over approximately ten years) under the direction of a se-

ries of infertility experts, Allegra Roseberry's first pregnancy resulted in the birth of Matthew Roseberry in 1983. In March 1988, Gary Roseberry noticed for the first time that "the whites of [Allegra's] eyes were somewhat yellow." On March 24, 1988, Allegra Roseberry was diagnosed at DeKalb General Hospital as having "sclerosing cholangitis, which is basically a scarring in the bile duct system of the liver." This is "a very serious liver problem. To date the only cure for it was a liver transplant." Allegra Roseberry was referred to The Emory Clinic for evaluation for a liver transplant. From the date of Allegra Roseberry's discharge from DeKalb General Hospital in March 1988 to May 27, 1988, Gary Roseberry noticed that Allegra's "skin color continued to become more of a coppertone or olive color." Also her abdomen became distended and she "lost . . . a little bit of weight. . . ." Gary Roseberry recalled the May 27, 1988, visit to Allegra Roseberry's regular physician, George R. Jones, M. D. (a named defendant but a non-party to this appeal), where she told Dr. Jones that "she felt like she was pregnant." Specifically, "her breasts were swollen and . . . rather tender, and her ears seemed to have fluid in them. . . ." Gary Roseberry further affirmed that Allegra Roseberry had "frequent [nighttime] urination[, . . . and] shortness of breath[.]" The Roseberrys had stopped active birth control in 1986. They were not actively seeking to have another child, and Gary Roseberry "felt with Allegra's infertility the chances were pretty slim [they] could have a child on [their] own."

On June 3, 1988, Allegra Roseberry had her first appointment with defendant Walter S. Brooks, M. D., a gastroenterologist at defendant The Emory Clinic. Gary Roseberry recalled that, after Allegra Roseberry had been examined, Dr. Brooks stated: " 'This woman needs a transplant now.' " During this visit, Allegra Roseberry told Dr. Brooks "that [she felt] pregnant." Although "[p]atients with sclerosing cholangitis are usually not an urgent transplant," a CT scan revealed a tumor in the liver and at that time the more serious diagnosis of cholangiocarcinoma (liver cancer) was made. However, in mid-June, while the Roseberrys were getting Allegra Roseberry's liver typed for a transplant and getting her on a waiting list, they were informed that "Allegra had terminal liver cancer. It really was beyond the point of a transplant, and it was our last hope. It was time to go home more or less." Specifically, a biopsy was performed of "one of the lymph nodes between the liver and the bile duct[.]" This confirmed that Allegra had "metastatic adenocarcinoma." The cancer had already spread from the bile duct "to the lymph glands." The oncologist at defendant The Emory Clinic, Martin York, M. D., told the Roseberrys that there was no chance of a transplant and that Allegra Roseberry had only "three to six months . . ." to live.

In late July 1988, the Roseberrys heard of an experimental chem-

otherapy being performed on liver cancer patients at Roswell Park Memorial Institute, in Buffalo, New York. As a prerequisite to this experimental chemotherapy, the patient must have a "low bilirubin level [and] Allegra . . . had a higher level than this protocol would allow." Dr. Brooks agreed that this experimental chemotherapy was "a long shot but it was [the Roseberrys'] best shot, it was [their] only shot, and . . . having reviewed the protocol . . . [suggested that a] liver [stent] be installed . . . [to] drain the liver and lower [Allegra Roseberry's] bilirubin count so that she could be admitted into this protocol." Without the experimental treatment, the Roseberrys anticipated that Allegra Roseberry's "life expectancy at best would be December," although they knew the end could come as soon as September or October.

The Roseberrys were advised that the liver stent involves "a very dirty part of the body[, . . . and that the] chances of infection were great[.]" After this insertion, and despite successful drainage, Allegra Roseberry "did not get the bounce off of the liver [stent] . . ." that was anticipated. Concerned that Allegra Roseberry was retaining abnormal fluid levels, Dr. Brooks ordered an ultrasound examination of her abdomen. It was this ultrasound examination that first revealed the existence of a fetus. Joseph H. Moyers, M. D., the radiologist who discovered the fetus, noted a positive heartbeat and observed the fetus "turning from side to side. The extremities were moving." He estimated its gestational age at "21 weeks [. . . varying] a week or so in either direction[.]"

David Plotkin, M. D., affirmed that Dr. Brooks' "failure to conduct a pelvic examination upon [Allegra Roseberry's] admission to the hospital deviate[d] from the standard of care expected of physicians generally[.]" Dr. Plotkin also "[did not] think . . ." the abortion procedure itself was within the standard of care. Duane Thiele, M. D., affirmed that "the records [he had] seen associated with Dr. Brooks' reasons for terminating the pregnancy . . . deviate[d] from the standard of care[.]" In Dr. Thiele's opinion, if Dr. Brooks concluded that the fetus was doomed and recommended an abortion "without consulting an obstetrician or gynecological person," that conduct fell below the standard of care. Watson A. Bowes, Jr., M. D., affirmed that Dr. Brooks' failure to have entertained pregnancy as a diagnostic possibility, to have ruled it out, was "a deviation [from] the standard of care expected of physicians under similar circumstances[.]" He disagreed that the fetus was doomed despite the presence of intense bile staining because he had "delivered [normal] children with bilirubins as high as 8 or 9, which is bilirubin as high as Mrs. Roseberry's." Additionally, the defense expert witness, Eugene R. Schiff, M. D., agreed that if Dr. Brooks "did not contemplate that an OB-GYN would independently evaluate the need for an abortion, if he didn't

even consider it . . . [then Dr. Schiff] would feel that that would be incomprehensible . . . [and] below the standard of care." In the opinion of John W. C. Johnson, M. D., another defense expert, for Dr. Brooks "to recommend an abortion without knowing [the amount of] x-ray exposure to the baby for the basis for the abortion would be inappropriate."

As to Dr. Ahn, Dr. Plotkin testified that "the failure of Dr. Ahn as a consult to personally familiarize himself with the reasons associated with his consultation . . . would be below the standard of care." Dr. Plotkin also affirmed that Dr. Ahn's "failure to have recorded specific information for reasons behind his actions in the accuracy of his record keeping [was . . .] a deviation of the standard of care expected of physicians generally[.]" Dr. Bowes would "expect an obstetrician before performing an abortion [to] sit down and satisfy himself as to the scope of the knowledge of the patient[.]" In Dr. Bowes' opinion, Dr. Ahn's failure to have done so "deviate[d] from the standard of care. . . ." Dr. Johnson testified that if Dr. Ahn "misunderstood the indications for the abortion . . ." his conduct fell below the standard of care. Dr. Johnson affirmed that, in his opinion, both Dr. Brooks and Dr. Ahn "were below the standard of care expected of physicians generally in not carefully noting in the chart the patient's options and the reasons and decisions for the pregnancy termination[.]"

The jury absolved Dr. Jones of all liability and further found for defendants as to that count alleging they caused the wrongful death of Allegra Roseberry. Nevertheless, the jury found that Dr. Brooks, Dr. Ahn, and The Emory Clinic negligently caused Allegra Roseberry pain and suffering, awarding her estate $250,000. The jury further found Dr. Brooks, Dr. Ahn, and The Emory Clinic jointly and severally liable for the wrongful death of the unborn female, Amy Roseberry, awarding her estate $1,500,000. Defendants' motion for judgment n.o.v., for new trial, or for "remittitur of damages" was denied. In Case No. A95A0353, defendants appeal from the joint and several judgment entered by the trial court on the jury's verdicts. In Case No. A95A0177, plaintiff appeals from the judgment of the trial court directing a verdict in favor of defendants as to plaintiff's claim for punitive damages. *Held*:

### Case No. A95A0353

1. In their second enumeration, Dr. Brooks, Dr. Ahn, and The Emory Clinic contend the trial court erred in denying their motion for directed verdict, arguing there is insufficient evidence to create a jury issue as to plaintiff's claim for the wrongful death of the unborn female, Amy Roseberry. A motion for judgment n.o.v. is appropriate only where there is no conflict in the evidence as to any material issue

and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict. OCGA § 9-11-50 (a). In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict. *Goggin v. Goldman*, 209 Ga. App. 251, 252 (433 SE2d 85).

"Negligence alone is insufficient to sustain recovery for wrongful death in a medical malpractice action. It must be proven that the death of a patient proximately resulted from such want of care or skill. A bare possibility of such result is not sufficient. Further, there can be no recovery in a wrongful death action based on medical negligence where there is no showing to any reasonable degree of medical certainty that the patient's death could have been avoided." (Citations and punctuation omitted.) *Dowling v. Lopez*, 211 Ga. App. 578, 579 (2), 580 (440 SE2d 205). " 'If an injury would have occurred notwithstanding the alleged acts of negligence of the defendant, there could be no recovery in an action for negligence.' (Citations and punctuation omitted.) *Jones v. Central of Ga. R. Co.*, 192 Ga. App. 806, 807 (386 SE2d 386) (1989)." *Butler v. South Fulton Med. Center*, 215 Ga. App. 809, 813 (3), 814 (452 SE2d 768).

In the case sub judice, plaintiff's evidence authorized the jury to conclude that Dr. Brooks and Dr. Ahn deviated from the standard of care in recommending and performing an abortion based in part on the erroneous diagnosis that this fetus had already been exposed to fatal dosages of radiation, and that they further deviated from the applicable standard of care in allowing Allegra Roseberry to consent to this abortion, induced in part by this diagnostic misapprehension. Plaintiff also adduced opinion evidence that it was technologically feasible to keep the fetus alive should Allegra Roseberry die from her liver cancer before the child became viable. However, other undisputed and uncontradicted evidence from each party's medical experts indicated that Allegra Roseberry would not be eligible for the experimental chemotherapy regimen at Roswell Park Memorial Institute while she was pregnant. Plaintiff's Exhibit 20 (a), which contains the protocol entry criteria for the experimental treatment, is silent on the issue of pregnancy. Nevertheless, Dr. Plotkin affirmed his "understanding as an oncologist that had [Allegra Roseberry] wanted to go [to] Roswell Park for [any] experimental protocol of chemotherapy and/or radiation, that the pregnancy would [probably] have disqualified her from that program[.]" Dr. Bowes affirmed that, in the medical community, it is "just common knowledge that almost all, if not all, experimental chemotherapy [regimens] and programs exclude pregnant women. . . ." Dr. Thiele conceded that "[m]ost protocols involving new drugs, radiation, it would exclude pregnant women." This is consistent with the opinions of defense medical experts. Dr. Johnson thought it "highly unlikely they would accept her in the ex-

perimental program if she was pregnant." Dr. Schiff testified "no radiation therapist would have ever given radiation to a pregnant woman, even if the baby was doomed."

There is also uncontradicted evidence that Allegra Roseberry knew she had an alternative reason for electing an abortion, and that reason was wholly unrelated to any acts of medical negligence as demonstrated by plaintiff's evidence. While giving her history to Dr. Young, Allegra Roseberry told him that "she had already decided to have a prostaglandin induction [abortion], not because of radiographic studies but because she said she wanted to go get the chemotherapy and try to improve her chances for survival." Dr. Thiele acknowledged "there may have been multiple reasons for . . . performing the abortion. Certainly one was that the patient, one of the patient's major objectives was to go to have experimental chemotherapy[, . . .] to qualify for that. . . ." Dr. Young "felt that the patient had a full understanding of everything and evidently had been counseled regarding the different options to her, because she stated in the history she had essentially two options, one to continue with pregnancy or, two, get experimental chemotherapy and go through the abortion. And she chose the latter because that was her only chance of survival."

"Certain results, by their very nature, are obviously incapable of any reasonable or practical division. Death is such a result[.]" Prosser & Keeton, Law of Torts, p. 347, § 52 (5th ed. 1984). See also *Parks v. Palmer*, 151 Ga. App. 468, 470 (2) (260 SE2d 493). " 'The general rule is that if, subsequently to an original wrongful or negligent act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune [or result], the former [negligence] must be considered as too remote. . . .' " *Griner v. Groover*, 97 Ga. App. 753, 756 (104 SE2d 504). See generally *McAuley v. Wills*, 251 Ga. 3, 6 (5) (303 SE2d 258). In the case sub judice, Allegra Roseberry desired to undergo a lawful abortion in order to qualify for experimental treatment at Roswell Park Memorial Institute, and thereby increase her own chances of surviving terminal liver cancer. The lawful abortion performed for that purpose is an intervening act which effectively caused the entire injury (death) to the unborn female, Amy Roseberry. Consequently, any medical negligence attributable to defendants is superseded by the mother's volitional act as the proximate cause of the death of the fetus. Since the entire injury "occurred notwithstanding [proven] acts of negligence of the defendant [doctors], there [can] be no recovery in [this wrongful death] action for [medical] negligence.' . . . [Cit.]" *Butler v. South Fulton Med. Center,* 215 Ga. App. 809, 813 (3), 814, supra. In the case sub judice, it is true that many evidentiary details and the opinions of medical experts were in conflict. Nevertheless, " '(p)laintiff simply failed to prove his case and the direction of the

verdict was [demanded]. (Cit.) The mere existence of conflicts in the evidence does not [preclude] the direction of a verdict . . . if [that verdict] was demanded, either from proof or from lack of proof on the controlling issue or issues. (Cit.)' (Emphasis [omitted].) [Cits.]" *Simmons v. Boros*, 176 Ga. App. 346, 347 (2), 348 (335 SE2d 662), aff'd 255 Ga. 524 (341 SE2d 2). In the case sub judice, the trial court erred in denying defendants' motion for judgment n.o.v. as to plaintiff's claim for the wrongful death of Amy Roseberry as the uncontradicted evidence does not warrant submission of the case to the jury. See generally *Maddox v. Houston County Hosp. Auth.*, 158 Ga. App. 283 (279 SE2d 732); *Parrott v. Chatham County Hosp. Auth.*, 145 Ga. App. 113 (243 SE2d 269).

2. In their fourth enumeration, defendants contend the trial court erred in denying their motion for judgment n.o.v. as to Allegra Roseberry's claim for pain and suffering.

Viewing the evidence in this case in the light most favorable to the party who obtained the verdict, the jury was authorized to conclude that the negligent failure to diagnose Allegra Roseberry's pregnancy sooner caused her pain and suffering through malnutrition. She competed (unknowingly) with the fetus for nutrients. According to Dr. Plotkin, the fetus usually wins the battle for nutrients that the mother is taking in. "If there's a shortage, the nutrients are diverted to the fetus[ . . . at] the expense of the mother." Consequently, Allegra Roseberry's strength and resistance to infection were degraded. This is sufficient evidence to support the award for pain and suffering against Dr. Brooks and The Emory Clinic. The trial court did not err in denying the motion for judgment n.o.v. as to Dr. Brooks. This same evidence, however, fails to show any "injury resulting from a want of [medical] care and skill . . ." on the part of Dr. Ahn as required by OCGA § 51-1-27. Also, plaintiff adduced no evidence that the physical pain Allegra Roseberry endured during the prostaglandin induced delivery she chose in an effort to increase her chances of surviving terminal liver cancer resulted from medical negligence committed during the abortion procedure itself. " ' "Negligence alone is insufficient to sustain recovery. It must be proven that the injury complained of proximately resulted from such want of care or skill. A bare possibility of such result is not sufficient." [Cit.]' [Cit.]" *Goggin v. Goldman*, 209 Ga. App. 251, 252, supra. "Where there is testimony showing a [mere] difference in views or individual practices among doctors, and where it is also shown that each view or practice is acceptable and customary, such evidence is insufficient to support a malpractice action. See *Hyles v. Cockrill*, 169 Ga. App. 132, 139 (12) (312 SE2d 124) (1983)." *Williams v. Smith*, 179 Ga. App. 712, 716 (3), 717 (348 SE2d 50). Consequently, the trial court erred in failing to grant judgment n.o.v. in favor of Dr. Ahn as to this claim.

3. In light of our holdings in Divisions 1 and 2, in Case No. A95A0353, the judgment as to Dr. Ahn is reversed in its entirety. As to Dr. Brooks and The Emory Clinic, the judgment is affirmed in part as to Allegra Roseberry's claim for pain and suffering, and reversed in part as to the wrongful death claim.

*Case No. A95A0177*

4. Plaintiff enumerates the direction of the verdict with respect to his claim for punitive damages, arguing that Dr. Brooks' hasty recommendation of an abortion was evidence of an attempt to mask his flawed diagnosis that the fetus was doomed.

Punitive "damages are not available in a wrongful death action. *Roescher v. Lehigh Acres Dev., Inc.*, 125 Ga. App. 420 (188 SE2d 154)." *Truelove v. Wilson*, 159 Ga. App. 906, 907 (2) (285 SE2d 556). In Georgia, the measure of recovery for the wrongful death of a child is the "full value of the life of the child[.]" OCGA § 19-7-1 (c). See also OCGA § 51-4-4. This amount "does not include recovery for mental anguish or emotional distress." *Ob-Gyn Assoc. of Albany v. Littleton*, 259 Ga. 663, 664 (1) (386 SE2d 146). Such recovery is nevertheless penal because it is not necessarily related to the "real value to the person in whom the cause of action is vested. [Cits.] . . . To hold that the jury can award additional exemplary damages under [former Civil Code (1910) § 4503, now OCGA § 51-12-5.1] would have the effect of imposing . . . a double penalty." *Engle v. Finch*, 165 Ga. 131, 134 (139 SE 868). Accordingly, in the case sub judice, any claim plaintiff might have for punitive damages exists solely with respect to the cause of action alleging defendants negligently caused Allegra Roseberry unnecessary pain and suffering. This issue is now moot with respect to Dr. Ahn. As to Dr. Brooks (and The Emory Clinic), the only circumstances advanced in support of this enumeration which do not relate to the wrongful death claim show that expert opinion evidence questioned Dr. Brooks' decision not to transfuse Allegra Roseberry before the abortion in order to build up her strength. In Dr. Bowes' estimation, the abortion "would have been best performed when the patient's condition [has been] stabilized [by] transfusions, which they [ultimately] had to do. [A prior] blood transfusion might have improved her capacity to tolerate this procedure."

"Under OCGA § 51-12-5.1 (b), which is applicable in the instant case, it remains the rule that something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage. There is general agreement that, because it lacks this element, mere negligence is not enough." (Citations and punctuation omitted.) *Ivey v. Golden Key Realty*, 200 Ga. App. 545 (1) (408 SE2d 811). " ' "If a tort is committed through

mistake, ignorance, or mere negligence, the damages are limited to the actual injury received," for vindictive or punitive damages are recoverable only when a defendant acts "maliciously, wilfully, or with . . . a wanton disregard of the rights of others." (Cit.)' *State Mut. Life &c. Assn. v. Baldwin*, 116 Ga. 855, 860 (3) (43 SE 262) (1903)." *Windermere, Ltd. v. Bettes*, 211 Ga. App. 177 (1), 178 (438 SE2d 406). " 'It is not essential to a recovery for punitive damages that the person inflicting the damages was guilty of wilful and intentional misconduct. It is sufficient that the act be done under such circumstances as evinces an entire want of care and a conscious indifference to the consequences.' [Cit.]" *Hodges v. Effingham County Hosp. Auth.*, 182 Ga. App. 173, 174 (2), 175 (355 SE2d 104). In our view, evidence in the case sub judice that Dr. Brooks chose not to transfuse Allegra Roseberry until after the prostaglandin induced abortion establishes mere professional negligence rather than clearly and convincingly evincing that entire want of care as will support punitive damages. The trial court correctly directed the verdict as to this claim.

*Judgment affirmed in part and reversed in part in Case No. A95A0353. Judgment affirmed in Case No. A95A0177. Andrews and Blackburn, JJ., concur.*

## On Motion for Reconsideration.

### Case No. A95A0353

Plaintiff Gary Roseberry contends that this Court has overlooked "the overwhelming evidence that the Roseberrys chose to abort the pregnancy because they were told the baby was *doomed*, that it had *no chance* of survival, and that the pregnancy was weakening Allegra [Roseberry]." (Emphasis in original.) He argues that this evidence "contradicts" Allegra Roseberry's statement to Dr. Young that showed she knew she had a choice and that she chose to survive.

Plaintiff's position mischaracterizes this Court's analysis and is erroneously premised on the misapprehension that Allegra Roseberry could have but a single reason for undergoing the abortion. On the contrary, this Court's analysis presupposes that plaintiff's evidence established that Dr. Brooks' incorrect diagnosis of nonviablity induced, in part, the decision to terminate the pregnancy. Nevertheless, all the evidence of Allegra Roseberry's initial motive does *not* contradict her last statement of intent, as related by Dr. Young, which *included* chemotherapy as an *additional* reason for terminating the life of her unborn child. Testimony is contradictory if one part asserts or expresses the opposite of another part of the testimony. See *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 30 (2) (343 SE2d 680). This additional motive of seeking experimental chemotherapy does

not express the opposite of choosing to terminate the pregnancy due to fetal nonviability. Rather, it expresses a parallel reason, existing simultaneously and independently of the negligently induced motive.

During the presentation of plaintiff Gary Roseberry's case-in-chief, portions of the October 4, 1991 deposition of Johnny Shan Young, M. D., were read into the record. Dr. Young expressly affirmed that he had "some independent recollections . . ." of Allegra Roseberry as a patient. When Dr. Young took Allegra Roseberry's history, "[h]er husband was present." "She was a very thin, ill-appearing, cachectic woman who was [jaundiced], probably as much jaundice as any patient I had seen. She did not look very healthy, but she seemed to be in good spirits despite her illness." She was "[v]ery coherent." "The patient stated that she wanted the prostaglandin induction so she might be able to go and get some experimental chemotherapy." Dr. Young "felt that the patient had a full understanding of everything and that she evidently had been counseled regarding the different options to her because she stated in my — in the history that essentially she had two options; one was continue with the pregnancy or, two, to get the experimental chemotherapy and go through an abortion. And she chose the latter because that was her only chance of survival."

Plaintiff Gary Roseberry contends that Dr. Young's testimony is suspect because it was given three years after the fact and introduced (by plaintiff) only through deposition. Only plaintiff Gary Roseberry, his deceased wife Allegra Roseberry, and Dr. Young had personal knowledge of what Allegra Roseberry said to Dr. Young as he took her history. However, when plaintiff Gary Roseberry was recalled to the stand, he never testified that, *contrary* to Dr. Young's testimony, Allegra Roseberry *never* said she wanted to undergo a clinical abortion (in part) so that she might take part in experimental chemotherapy. Plaintiff Gary Roseberry was quite certain that Dr. Brooks was untruthful about certain matters but he was silent on the substance of Dr. Young's testimony. Thus, the record shows that the only person who could, from personal knowledge, refute Dr. Young's testimony, failed to do so.

Next, plaintiff Gary Roseberry contends that Allegra Roseberry's statement to Dr. Young was impeached by Dr. Young's own records. However, plaintiff's counsel elicited that medical records list Allegra Roseberry as having been admitted to the transferring hospital "to have percutaneous drainage in consideration for chemotherapy." Further review of the transcript shows that Dr. Young's own notes of Allegra Roseberry's history recite: "The patient is currently undergoing percutaneous drainage of her biliary tract prior to receiving experimental chemotherapy." When directly questioned by plaintiff's counsel whether he had any specific recollection that Allegra Roseberry

wanted experimental chemotherapy after she learned she was pregnant, Dr. Young testified: "What she said when I saw her this day, August the 8th, was that she wanted chemotherapy. And that was after she learned she was pregnant." Thus, the medical records tend to confirm rather than impeach Dr. Young's testimony that Allegra Roseberry wanted to undergo the clinical abortion (in part) in order to preserve her chances of being admitted into the experimental protocol, with the hope that, thereby, her life might be saved.

Finally, plaintiff Gary Roseberry contends there is no evidence that Allegra Roseberry knew or believed that she must undergo an abortion in order to qualify for the experimental chemotherapy. However, the proof of this comes from the plaintiff himself. When Dr. Brooks first informed the Roseberrys that Allegra Roseberry was pregnant and that the fetus should be aborted, Allegra Roseberry, according to plaintiff Gary Roseberry's testimony on direct examination, "almost was happy about this pregnancy, even knowing what it meant, even knowing that she had to go through an abortion to get to Buffalo." This is unchallenged evidence that both Allegra Roseberry and plaintiff Gary Roseberry believed all along that the abortion was a necessary predicate to Allegra Roseberry's entry into the experimental chemotherapy regimen at Roswell Park Memorial Institute in Buffalo, New York.

*Motion for reconsideration in Case No. A95A0353 is denied.*

DECIDED JULY 14, 1995 —
RECONSIDERATION DENIED JULY 28, 1995 — ■■■■■■

*Weinstock & Scavo, Michael Weinstock, Louis R. Cohan, Love & Willingham, Robert P. Monyak*, for appellants.

*Allen & Peters, Jonathan C. Peters, Carol S. Colby*, for appellees.